**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| **IDEXX LABORATORIES, INC.**, a Delaware corporation;<br><br>            Plaintiff,<br><br>    v.<br><br>**DAN LEACH**, an individual,<br>**AGOSTINO SCICCHITANO**, an individual, and<br>**DIRECT VET MARKETING, INC.**, doing business as VETS FIRST CHOICE, a Delaware corporation<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiff, IDEXX Laboratories, Inc. ("IDEXX"), for its Complaint against Defendants Dan Leach ("Leach"), Agostino Scicchitano ("Scicchitano"), and Direct Vet Marketing, Inc., doing business as Vets First Choice ("VFC"), states as follows:

**BRIEF NATURE OF THE ACTION**

1.      This is an action for breach of contract, actual and/or threatened misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq.*, and the Maine Uniform Trade Secrets Act, and tortious interference with contract. IDEXX seeks damages and injunctive relief.

2.      IDEXX is a world leader in veterinary diagnostic instrument development and manufacture, reference laboratory services, and dairy and water testing. Put simply, IDEXX keeps animals healthy, and milk and water safe. Amongst other areas in which IDEXX specializes, it designs diagnostic testing services as well as training modules to better assist veterinarians and veterinarian clinics in servicing people's pets.

3.      Moreover, and particularly important, IDEXX designs and develops information technology platforms that help veterinarians, veterinarian clinics, and other companion animal healthcare providers to manage their practices and better communicate with patients.

4.      Until recently, Leach and Scicchitano were employed by IDEXX in varying roles. Notably, two things bind them together. First, both resigned and hid the fact that they were taking employment with VFC. And, second, both apparently downloaded and misappropriated IDEXX's trade secrets within the days leading up to their IDEXX resignation.

5.      On or around December 1, 2017, Leach resigned from IDEXX and accepted a position with VFC. Several months later, during a wave in which VFC hired a half dozen or more IDEXX employees, on April 2, 2018, Scicchitano resigned from IDEXX, also accepting a position with VFC.

6.      Like IDEXX, VFC provides technology-enabled healthcare services for veterinarians. Moreover, identical to IDEXX it seeks to create data-driven solutions to help veterinarians close patient care gaps and drive better customer communication. Since 2017, VFC has hired at least nine IDEXX employees.

7.      As a result of the aggressive hiring practices that VFC was utilizing, and given IDEXX's particularized concern that its former employees possessed and would use its confidential and trade secret information against IDEXX, IDEXX sent various letters to VFC informing VFC about its former employees' ongoing obligations owed to IDEXX.

8.      After exchanging letters with VFC and still being concerned about these departures, IDEXX imaged and inspected the computer assigned to both Leach and Scicchitano during their respective IDEXX employments, in part due to the fact that each misled IDEXX as to where they were to be subsequently employed.

9.      In conducting this analysis, IDEXX uncovered activities on Leach's and Scicchitano's computers that strongly suggest that both Leach and Scicchitano improperly accessed and downloaded and/or retained highly confidential IDEXX information, including proprietary planning documents and internal training materials. Such information is highly confidential to IDEXX, is not known generally

within IDEXX—or by IDEXX's outside competitors—and would give Leach, Scicchitano, and VFC an unfair competitive advantage.

      10.    In particular, IDEXX's forensic review uncovered the following regarding Leach's activities:

    a.  On October 18, 2017, the day before Leach initially told IDEXX that VFC had offered him a job, *for the first time in his IDEXX career*, he inserted an external media device into his IDEXX computer, during which time he appears to have accessed a series of confidential IDEXX documents, presumably for purposes of downloading them onto the external media device;

    b.  On October 26, 2017, Leach accessed a Microsoft OneDrive account on his IDEXX computer, during which time he also accessed a series of confidential IDEXX documents, presumably for purposes of uploading them to OneDrive.

    c.  On November 30, 2017, the day before Leach's employment with IDEXX ended, he accessed a series of extremely confidential IDEXX documents pertaining to, among other things, IDEXX's internal processes and strategic decision-making documents, as well as a series of IDEXX documents pertaining to a series of products being developed for one of the largest animal food product manufacturers in the country. None of the files that Leach accessed pertained to his IDEXX duties or responsibilities.

      11.    Additionally, IDEXX's forensic review uncovered the following regarding Scicchitano's activities:

    a.  On March 16, 2018—the same day that Scicchitano performed a search for VFC using Google—he installed Dropbox on his computer. He later updated Dropbox on his computer on March 29, 2018.

    b.  A review of the Dropbox folders on Scicchitano's IDEXX computer shows a series of files and folders which seemingly contain IDEXX's confidential and trade secret information, including folders relating to IDEXX confidential in-house developed training programs, for which he was responsible while at IDEXX.

    c.  On April 3, 2018, the day after Scicchitano announced his resignation from IDEXX, he inserted two separate external media devices into his IDEXX computer, which, given his external media device usage in 2018, was highly unusual.

    d.  Also on April 3, 2018, Scicchitano performed a series of Google searches in which he sought information pertaining to how to: "delete emails from outlook permanently," "deleting outlook profile from computer," "manually remove outlook emails," and "erase entire outlook file on pc."

12.     Each of these activities, by themselves, would be troubling, but when coupled with the fact that VFC aggressively recruited away several IDEXX employees over the last year, it signals that VFC is attempting to jumpstart its business with IDEXX information and trade secrets. Moreover, IDEXX has learned that, in recruiting IDEXX employees, VFC is telling IDEXX employees (who have been bound by restrictive covenants, including non-compete agreements) that the IDEXX's agreements are "not an issue". Put simply, it appears that VFC is incentivizing IDEXX employees to not only violate their non-compete agreements, but also to misappropriate IDEXX's trade secrets.

13.     This is particularly clear given that IDEXX repeatedly wrote to VFC (and its former employees, including Leach and Scicchitano), demanding the return of its information and requesting compliance with its agreements, but receiving no substantive response in return.

14.     Because, of this, IDEXX seeks damages and injunctive relief to address Leach's and Scicchitano's improper activities, enforce its agreement with them, seek the return and prevention of misappropriation of its technology and information, through the Maine Uniform Trade Secrets Act and the Defend Trade Secrets Act, 18 U.S.C. §1832, *et seq.* ("DTSA"), and to seek damages for VFC's tortious interference and misappropriation.

## PARTIES

15.     IDEXX Laboratories, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Westbrook, Maine.

16.     Dan Leach was employed by IDEXX starting in August 2015. He is domiciled in and a resident of Saco, Maine. He voluntarily resigned effective December 1, 2017.

17.     Agostino Scicchitano was employed by IDEXX starting in May 2010. He was previously domiciled in Stamford, Connecticut when he was employed with IDEXX and is currently, on information and belief, domiciled in and a resident of Land O Lakes, Florida. He voluntarily resigned effective April 13, 2018.

18.     Vets First Choice is a corporation organized and existing under the laws of the State of Delaware, with its principle place of business in Portland, Maine.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331, because IDEXX's DTSA claim against Defendants, under 18 U.S.C. §1836, *et seq.*, raises a federal question. Supplemental jurisdiction also exists over each of the claims under 28 U.S.C. § 1367 and none of the exceptions to § 1367 apply.

20.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(b), as Leach and VFC reside in this venue, and a substantial portion of the events giving rise to this complaint occurred in this venue, including, but not limited to Scicchitano's misappropriating actions.

## EVENTS GIVING RISE TO THIS ACTION

### IDEXX'S BUSINESS

21.     While IDEXX operates in a number of spaces (discussed below), one of its primary business areas is providing diagnostic and information management services for veterinarians and veterinary clinics throughout the United States and the world. Through its work, IDEXX is able to help veterinarians provide first-in-class medical services to family pets and other companion animals.

22.     In particular, IDEXX develops, manufactures, and distributes products and provides services primarily for the companion animal veterinary, and livestock, poultry, dairy, and water testing markets.

23.     IDEXX's primary products and services are: (a) point-of-care veterinary diagnostic products, comprised of instruments, consumables, and rapid assay test kits; (b) veterinary reference diagnostic and consulting services; (c) practice management and diagnostic imaging systems and services used by the biomedical research community; (d) diagnostic, health-monitoring products for

livestock, poultry, and dairy; (e) products that test water for certain microbiological contaminants; and (f) point-of-care electrolytes and blood gas analyzers used in the human point-of-care medical diagnostic market.

24.     IDEXX primarily operates through three business segments, which are its: (a) Companion Animal Group ("CAG"), through which IDEXX provides diagnostic and information technology-based products and services for the veterinary market and for those manufacturers of products directed toward the veterinary market; (b) Water Group; and (c) Livestock, Poultry, and Dairy ("LPD"). Both Leach and Scicchitano primarily worked with CAG.

25.     Through CAG, IDEXX offers a breadth of products and services. Such products and services include: (a) integrated diagnostic information management, whereby IDEXX provides veterinarians with clinically relevant data which is integrated within IDEXX-provided information management technologies, including through VetConnect PLUS; (b) in-clinic diagnostic solutions, through which veterinarians utilize IDEXX's VetLab suite of in-clinic chemistry, hematology, immunoassay, urinalysis, and coagulation analyzers, associated proprietary consumable products, all of which provide real-time reference lab quality diagnostic results; (c) veterinary software and services, through which IDEXX provides practice management systems that run key functions of veterinary clinics, such as managing patient electronic health records, scheduling, client communication, billing, and inventory management; and (d) diagnostic imaging systems, which capture radiographic images in digital form, and which replaces traditional x-ray film.

26.     Because IDEXX operates on an international basis in the veterinary space, IDEXX employs a wide variety of professionals to help it operate CAG.

27.     For example, because IDEXX offers software and other information technology management programs, it employs individuals who are responsible for engineering such products, as well as a host of other individuals who provide upstream and downstream services for the delivery of

such products. One such type of person is a business analyst, like Leach, who is responsible for meeting with customers, identifying product needs, and then working with the engineering team so that the engineering team understands the functions sought by IDEXX's customers.

28. Also, because IDEXX sells its services to a wide swath of customers on a nationwide basis, it also employs a host of sales representatives, who not only need to be able to sell IDEXX's product, but they also need to understand how that product works. To ensure that IDEXX's sales force understands IDEXX's products and services, IDEXX also employs certain sales trainers, such as Scicchitano, who are responsible both for training IDEXX employees as well as designing IDEXX's proprietary in-house training programs.

29. IDEXX's products have a broad appeal and acceptance in the marketplace and among the veterinary community. Indeed, IDEXX is the market leader in veterinary information technology management software and diagnostic testing in the companion animal market.

30. IDEXX invests substantial time and money in sales representatives who cultivate and maintain long-term relationships with veterinarians, veterinary clinics, and other managed animal health organizations. These relationships often take years to establish and are crucial to the success of its business.

31. In addition to the time and money IDEXX invests in developing and maintaining its customer relationships, it developed and offers innovative and proprietary training programs and state-of-the-art, customer-specific data-driven marketing, which has enabled it to grow and maintain its market share.

32. Finally, IDEXX invests millions of dollars and years developing new technologies to bring to the market, all of which has allowed it to develop and maintain its position in the companion animal healthcare space.

<u>LEACH'S EMPLOYMENT WITH IDEXX</u>

33.     Leach was employed by IDEXX starting in August 2015 until December 1, 2017.

34.     During his IDEXX employment, Leach served as a Business Analyst for IDEXX's Veterinary Software & Services Data Team. In essence, a business analyst is someone who works with external customers to determine their software needs and then communicates those needs to IDEXX's software engineers, who then develop custom solutions for IDEXX's customers. In this position, Leach acts as a translator, interpreting customer needs, writing a story to capture the customer needs, and discusses those needs with software engineers to ensure that the customer needs are met. Within IDEXX, these translation documents are referred to as "stories."

35.     One of the projects on which Leach worked was IDEXX's proprietary eCoupon platform, through which he worked with IDEXX's customers (who represent some of the largest

companion animal food and healthcare manufacturers) to use data analytics to perform targeted marketing on behalf of these IDEXX customers.

36.     As discussed above, one of IDEXX's areas of focus is in creating customized software to better help veterinary clinics to manage their businesses. In so doing, IDEXX is able to aggregate large swaths of data pertaining to buying trends, purchasing history, treatment history, and customer engagement with various product manufacturers and product types.

37.     With this information, IDEXX, through its business analysts, like Leach, are able to thereafter create customized eCoupon programs for certain pharmaceutical and pet food/pet healthcare product manufacturers.

38.     Given the nature of his position, Leach was exposed to both the functional side of IDEXX's business (i.e., software programming), as well as being customer facing.

39.     In this role, Leach was responsible for:

    a.   Ensuring the software development team stayed aligned with business needs;

    b.   Grooming stories to drive an ongoing, well-defined backlog of work;

    c.   Creating and maintaining a product roadmap that reflects constantly evolving team capabilities for software development and targeted data collection;

    d.   Serving as the bridge between development and the business; and

    e.   Serving as one of IDEXX's customer-facing liaisons to ensure that customer needs and expectations are met.

40.     In his role, Leach acquired intimate knowledge of and experience with IDEXX's proprietary techniques, processes, and strategies as it relates to its new product development as well as IDEXX's customers' specific and specialized needs.

41.     Based on his role and responsibilities, Leach also had direct knowledge of the software that would run IDEXX's next generation veterinary product portfolio. This information is highly confidential and is neither generally known within IDEXX nor is it publicly available.

42.     In addition, during 2016, Leach assumed managerial responsibilities when one of his co-workers was out on maternity leave, during which time Leach shepherded the eCoupon contract renewal with one of IDEXX's largest customers, and was responsible for a data contract migration to a new data collection platform. While serving in this interim role, Leach was exposed to even more IDEXX customer-specific confidential information, including detailed, confidential contract terms.

43.     Through his IDEXX employment, Leach acquired and helped develop IDEXX confidential and trade secret information relating to its customers' software preferences in the eCoupon segment, the data analytics that IDEXX was utilizing for purposes of developing these programs, IDEXX's product development plans and strategies in the veterinary software and services segment ("VSS"), detailed information pertaining to IDEXX's software development plans and deliverables, details pertaining to IDEXX's customer contracts, including contract termination dates, and other

information pertaining to IDEXX's VSS business, people, and customers that is not known to the public or IDEXX's competitors, including VFC.

**SCICCHITANO'S EMPLOYMENT WITH IDEXX**

44.    Scicchitano was employed by IDEXX starting in May 2010 until April 2018.

45.    During his IDEXX employment, Scicchitano held a number of positions, including as a Diagnostic Practice Consultant, a number of Sales Trainer roles, and finally as IDEXX's Senior Instructional Designer - Sales Training Content.

46.    To ensure that IDEXX's sales force best understands how to sell IDEXX's products, IDEXX must not only help its employees best understand sales techniques, but it must provide certain levels of medical training. This training is essential so that IDEXX's employees understand and can work with veterinarians to provide information as to how IDEXX's various diagnostic tests, diagnostic imaging products, and other products can help a veterinarian and, by extension, pets.

47.    For example, every IDEXX sales employee receives three weeks of classroom training during the first year of their IDEXX employment, and, thereafter, spends approximately one week each subsequent year in additional training on new products, new sales techniques, and other training developed in-house at IDEXX to ensure that IDEXX provides best-in-class products and service to its customers.

48.    In addition to classroom learning, IDEXX also utilizes virtual learning training modules. Indeed, every quarter, the sales force is required to complete at least two training assignments, covering assessment of knowledge, pre-learning on upcoming product launches, and product training.

49.    Given the high learning curve that exists to understand these technologies, IDEXX invests heavily in not only training its employees, but in developing cutting age, state-of-the-industry training programs. These programs are developed entirely in-house at IDEXX, are not shared outside IDEXX, and provide IDEXX with a significant competitive advantage, insomuch as, among other

things, it trains IDEXX sales representatives on complex products and how to communicate with veterinarians about those products.

50.     In his last role with IDEXX, Scicchitano was integral to the development and implementation of IDEXX's training program. In particular, he was responsible for:

      a.  Defining curriculum needs;

      b.  Developing IDEXX's internal, proprietary training courses, including learning modules, audits, certifications, and training to support real time educational initiatives;

      c.  Understanding assessment requirements;

      d.  Creating interactive scenarios and leading a new training regime that IDEXX has been developing over the past year;

      e.  Executing multiple trainings across various disciplines and subject matters within IDEXX;

      f.  Training new hires and supporting the training team by providing in-person trainings through ride-alongs;

      g.  Leading various curriculum review projects; and

      h.  Refining the structure and accountability tracking metrics for new hires, as well as coaching the lead trainers for the same program.

51.     In his last role with IDEXX, Scicchitano operated in more of a strategic role, developing IDEXX's revamped training program, as well as its new curriculum. Because of his varying roles within IDEXX, Scicchitano's responsibilities for IDEXX were nationwide in nature.

52.     Moreover, while Scicchitano did not have any direct reports, he worked cross-functionally, and interacted heavily with IDEXX's customer-facing organization ("CFO"), varying sales leadership teams, both in the United States and Canada.

53.     Through his IDEXX employment, Scicchitano acquired and helped develop IDEXX confidential and trade secret information relating to its training programs, strategy pertaining to its training programs, learned detailed information pertaining to IDEXX's software development plans and deliverables, details about its upcoming chemical analyzer, hematology, and other product

11

developments, and detailed information pertaining to IDEXX's sales force employees' strengths and weaknesses that is not known to the public or IDEXX's competitors, including VFC.

## IDEXX TAKES REASONABLE MEASURES TO PROTECT ITS CONFIDENTIAL INFORMATION

54.     As a company, IDEXX has significant confidential and trade secret information. In an effort to define for employees what such information includes, IDEXX defines its confidential information in a number of places. For example, in IDEXX's Code of Ethics, it explains to employees that "Confidential Information" includes, but is not limited to:

> information about a new IDEXX technology under development; the timing of (including any delay in) the launch of a new IDEXX product; the possible acquisition of a reference lab's customer list or any other business or asset; the revenue growth or other financial measure of any IDEXX product, business or region; the signing (or loss) of any customer contract or business; and any reorganization or other change in IDEXX personnel.

55.     Moreover, in the Employee Handbook, IDEXX provides additional examples of what constitutes Confidential Information, explaining that "Confidential Information" also may include:

a.  Information about a customer or prospective customer that is obtained when providing an IDEXX product or service;

b.  Customer lists;

c.  Employee information (information that identifies individuals who are employees of, or applicants for employment by, IDEXX or their dependents or beneficiaries, including personnel files, compensation or benefits information);

d.  Financial information;

e.  Sales and marketing strategies;

f.  New materials research;

g.  Pending projects and proposals;

h.  Proprietary production processes;

i.  Research and development strategies;

j.  Scientific data, formulas and prototypes;

k.  Technological data prototypes; and

l.  Employee telephone lists.

12

56.     To protect this information, particularly from competitors like VFC, IDEXX requires that it be kept strictly confidential by its employees and restricts access to this information.

57.     IDEXX takes specific and rigorous measures to preserve the confidentiality of this information, including but not limited to, the following:

(a)     requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return its property upon termination;

(b)     requiring employees to acknowledge receipt and understanding of both the employee handbook and code of ethics, both of which further explain an employee's confidentiality obligations owed to IDEXX;

(c)     prohibiting the use of its materials in areas not directly related to its business, or the removal or borrowing of its property without permission;

(d)     using badge IDs to restrict access to and within its facilities to which Leach and Scicchitano had access;

(e)     prohibiting the use of its computer systems for non-company purposes;

(f)     restricting access to its computerized information through the use of passwords;

(g)     prohibiting non-IDEXX employees from accessing company confidential information; and

(h)     restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

58.     IDEXX rigorously maintains the confidentiality of its information because the information provides IDEXX a competitive advantage in the marketplace from which it derives economic value.

59.     IDEXX's trade secrets and confidential and proprietary information regarding its product developments would give any organization an advantage by not expending the time and resources to develop the trade secrets and confidential and proprietary information as IDEXX has done.

**LEACH'S & SCICCHITANO'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO IDEXX**

60.     On or about May 25, 2010, as a condition of his employment, Scicchitano executed the Invention and Non-Disclosure Agreement ("Scicchitano Non-Disclosure Agreement") and the Non-

Compete Agreement ("Scicchitano Non-Compete") (collectively, the "Scicchitano Non-Disclosure Agreement" and "Scicchitano Non-Compete" are referred to as the "Scicchitano Agreements"), both of which contain certain reasonable post-employment contractual obligations owing to IDEXX. True and correct copies of the Scicchitano Agreements are attached as Exhibits 1 and 2.

61.    On or about August 13, 2015, as a condition of his employment, Leach executed the Invention and Non-Disclosure Agreement ("Leach Non-Disclosure Agreement") and the Non-Compete Agreement ("Leach Non-Compete") (collectively, the "Leach Non-Disclosure Agreement" and "Leach Non-Compete" are referred to as the "Leach Agreements"), both of which contain certain reasonable post-employment contractual obligations owing to IDEXX. True and correct copies of the Leach Agreements are attached as Exhibits 3 and 4.

62.    Based on the terms of the Agreements and offer letters, Scicchitano and Leach received employment, benefits, access to IDEXX's bonus program, and access to and receipt of IDEXX's trade secrets and confidential information, in exchange for their execution of the Agreements.

63.    Importantly, through their Agreements, Scicchitano and Leach agreed to certain obligations during and after his IDEXX employment terminated.

64.    In particular, Leach and Scicchitano agreed to protect and return to IDEXX its confidential information. Specifically, their Non-Disclosure Agreements define "Confidential Information" to include, among other things: "trade secrets, processes, data, know-how, marketing plans, forecasts, unpublished financial statements, budgets, licenses, prices, costs and employee, customer and supplier lists." (Scicchitano & Leach Non-Disclosure Agreements, §2(a).)

65.    Specifically, Leach and Scicchitano agreed that:

I recognize that my relationship with the Company is one of high trust and confidence by reason of my access to and contact with the trade secrets and confidential and proprietary information of the Company and its customers and contractors. ***I will not at any time, either during my employment with the Company or thereafter, disclose to others, or use for my own benefit or the benefit of others, any of the Developments or any***

14

*confidential, proprietary, or secret information owned, possessed or used by the Company or its customers or contractors*.

(Id. at § 2(a) (emphasis supplied).)

66.     In executing the Agreement, Leach and Scicchitano also expressly agreed that, upon termination of his employment with IDEXX, he would:

> Upon termination of my employment with the Company …, I will promptly deliver to the Company all notes, memoranda, notebooks, drawings, records, reports, files and other documents (and all copies or reproductions of such materials) in my possession or under my control, whether prepared by me or others, which contain Proprietary Information. I acknowledge that this material is the sole property of the Company.

(Id. at 2(c).)

67.     Additionally, both Leach and Scicchitano agreed to certain reasonable post-employment restrictions. Namely, both agreed that:

> While I am employed by the Company and for a period of two (2) years after the voluntary termination of such employment by me …, I will  not directly or indirectly:
>
> (a)     Engage (whether for compensation or without compensation) as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, lender, or in any other capacity whatsoever (otherwise than as the holder of not more than one percent (1%) of the total outstanding stock of a publicly held company), in any business enterprise which competes with the Company in any business area in which the Company is engaged including, but not limited to, the animal and agricultural diagnostic field and the food and environmental testing field; or
>
> (b)     Recruit or otherwise solicit or induce any employee of the Company to terminate their employment with, or otherwise cease their relationships with, the Company.

(Non-Compete Agreements, §1.)

68.     Both Leach and Scicchitano agreed that the Non-Compete and Non-Disclosure Agreements would be governed by Maine law. (Non-Compete Agreements, §3(e); Non-Disclosure Agreements at Miscellaneous, subparagraph (f).)

LEACH'S PRE-RESIGNATION ACTIVITIES & HIS EMPLOYMENT WITH VFC.

69.     On October 17, 2017, Leach informed his direct supervisor, Patty Minerich, that he had received a job offer from VFC. In discussing this offer, he told IDEXX that his responsibilities for VFC would include serving in a:

> Business analyst role supporting the engineering team that develops client-facing Ux interfaces (clinic- and consumer-facing web interactions) for new and existing eCommerce product lines, as well as internal workflow management interfaces (such as shopping cart order placement <-> fulfillment center hand-off, et cetera).

In essence, as Leach described his potential role with VFC, it was identical to his IDEXX role.

70.     During the same conversation, Minerich reminded Leach of his non-compete agreement, to which Leach responded that "the recruiter at VFC told him that … the non-compete is not an issue."

71.     Because VFC entered the software space in 2017, IDEXX viewed this job offer with great concern.

72.     The following day, Minerich again met with Leach. During this meeting, Minerich told Leach that IDEXX would enforce his non-compete should he decide to accept the job with VFC.

73.     Leach was frustrated by this, and requested a copy of the non-compete for purposes of having VFC and a third-party review the agreement.

74.     On October 19, 2017, Minerich again met with Leach, during which meeting Leach informed her that he had provided a copy of the non-compete to VFC.

75.     More importantly, during the meeting, Leach admitted to having received "important proprietary information" around IDEXX's practice intelligence business.

76.     Over the next several weeks, Leach did not take a job with VFC, and IDEXX believed that Leach had turned down VFC's offer.

77.     On November 15, 2017, Leach informed Minerich that he had accepted a job with a different company. During the course of that meeting, Leach declined to share where he was going, but

told Minerich that he was not going to an IDEXX competitor and that he had spoken with an attorney to understand his obligations under the Non-Compete Agreement and Non-Disclosure Agreement.

78. Leach's last day with IDEXX was December 1, 2017.

79. Approximately a week later, IDEXX learned that Leach—despite his claims to not be taking employment with a competitor—was indeed working for VFC.

80. In response, IDEXX sent a cease and desist letter to both VFC as well as Leach. Copies of IDEXX's cease and desist letter to Leach and to VFC are attached hereto as Exhibits 5 and 6.

81. On January 2, 2018, IDEXX received a response from VFC acknowledging receipt of IDEXX's cease and desist letter, but IDEXX did not receive any substantive response from VFC. (A true and correct copy of VFC's Jan. 2, 2018 response is attached as Exhibit 7.)

82. Contemporaneously with sending cease and desist letters out, IDEXX also forensically imaged and analyzed the iPhone and computer which Leach was issued by IDEXX.

83. In performing that analysis, IDEXX discovered a number of highly questionable items that lead IDEXX to two conclusions: (1) Leach misappropriated IDEXX's confidential and trade secret information; and (2) given that he was less than forthright with IDEXX about his future employment, he used it on VFC's behalf.

84. What IDEXX learned is as follows:

   a. On October 18, 2017, for the first time in his IDEXX career, Leach inserted an external thumb drive into his IDEXX-issued computer. This thumb drive bore serial number 92B408BE, and was inserted into his IDEXX computer at 8:37 AM. This was the ***only*** time in Leach's two-plus year IDEXX career that he inserted a thumb drive into his computer. Moreover, this occurred the day after he initially told IDEXX that he was offered a job at VFC.

   b. On October 26, 2017, Leach utilized Microsoft OneDrive on his IDEXX computer. Unauthorized use of Cloud-based storage repositories is prohibited by IDEXX.

   c. On November 15, 2017, Leach misled IDEXX into believing that he was taking a position with a company that was not competitive with IDEXX. Based on IDEXX previously informing Leach in October 2017 that IDEXX considered VFC to be a competitor, Leach's representations were made with the intent of deceiving IDEXX.

    d.   On November 29, November 30, and December 1, 2017, Leach accessed a series of highly confidential documents on IDEXX's computer system, for which Leach had no business accessing. Moreover, Leach's IDEXX computer was docked with an IDEXX wireless printer and, on information and belief, Leach accessed and printed the documents.

    e.   That Leach deleted all of the information on his IDEXX-issued iPhone by resetting the phone to factory settings, thereby deleting all information on the phone.

85.    Among the documents that Leach accessed during those days were:

    a.   A series of documents relating to IDEXX's lean management data development projects;

    b.   A series of documents relating to IDEXX's development backlog (which is essentially an intraweb in which IDEXX's ongoing and upcoming software development projects are discussed in depth);

    c.   A series of documents relating to IDEXX's development backlog for IDEXX's two largest clients in the VCC space, including the backlog for each of these clients and the program requirements;

    d.   A series of documents relating to IDEXX's product support dashboard; and

    e.   A series of highly confidential process maps, that are utilized internally at IDEXX and are not shared outside of a small set of individuals.

86.    Giving his timed resignation, current responsibilities, and overarching job duties, Leach had no legitimate business reason to access these documents.

87.    Around the time that IDEXX received the forensic results pertaining to Leach's efforts, it faced a new and equally concerning threat: VFC was in the process of hiring six other IDEXX employees, including Scicchitano.

**SCICCHITANO'S PRE-RESIGNATION ACTIVITIES & HIS EMPLOYMENT WITH VFC.**

88.    On April 2, 2018, without any notice that he was looking for other employment, Scicchitano suddenly resigned his employment with IDEXX. In his resignation letter, Scicchitano did not disclose that he was leaving for VFC. Moreover, he wrote: "I am leaving to pursue other professional opportunities that will continue to align with my passion for adult learning and corporate training."

89.     Despite not advising of his departure to VFC in his resignation email, later that day, Scicchitano sent a text message to Christina Peterson, another IDEXX employee, and informed her that:

> Wanted to let you know that yes, VFC recruited me to build their entire training program from the bottom up. I'm really excited about the opportunity. Sorry about this morning, I wasn't trying to be elusive I just hadn't had all he (sic) details in place yet and didn't want to let you know until I did.

90.     Upon learning that Scicchitano was leaving IDEXX for VFC, IDEXX sent a cease and desist letter to VFC. In the letter, among other things, IDEXX wrote:

> It is disappointing to learn that VFC has advised at least some of these employees that IDEXX and VFC are not competitors, thereby creating the misimpression and false comfort that they are not in violation of their agreements with IDEXX. In fact … VFC and IDEXX compete directly in the field of diagnostics data and veterinary practice intelligence, including data driven diagnostics insights which are critical to customer performance and IDEXX's core competitiveness.

(April 4, 2018 Cease and Desist Letter, p. 1 (attached as Exhibit 8).)

91.     In the letter, IDEXX further informed VFC that it would be further forensically examining the computers of the seven recently departed IDEXX employees. Moreover, it directly told VFC that IDEXX strongly suspected Leach of having misappropriated IDEXX's trade secrets, based on a forensic examination it conducted of Leach's computer. (Id., p. 2.)

92.     In the aftermath of this letter, IDEXX followed through and forensically imaged Scicchitano's computer as well.

93.     Like the results of Leach's forensic examination, the results of Scicchitano's are also particularly concerning and leave IDEXX with the strong belief that Scicchitano misappropriated IDEXX's confidential and trade secret information. Moreover, given that Scicchitano is tasked with building VFC's training program from the ground up and the documents he seemingly misappropriated relate to IDEXX's best-in-class training, it appears that Scicchitano intends to use or has used IDEXX's trade secrets on VFC's behalf.

94.     In particular, what IDEXX learned following the forensic examination of Scicchitano's computer is as follows:

    a.   On March 16, 2018, Scicchitano performed a Google search for "Vets First Choice", suggesting that, by that point, VFC had reached out to Scicchitano about a possible position;

    b.   On March 16, 2018 (the same day that Scicchitano performed a Google search for VFC), he downloaded Dropbox onto his IDEXX-issued computer. Later, on March 29, 2018, Scicchitano uploaded a newer version of Dropbox onto his IDEXX-issued computer;

    c.   Several times between March 23rd and March 27th, Scicchitano performed a Google search for "Vets First Choice", "Vets First Choice Corporate Headquarters" and/or "Vets First Choice Corporate Headquarters Portland, ME";

    d.   On March 31, 2018, Scicchitano performed a Google search for "How do you export outlook contacts into excel";

    e.   On April 1, 2018, Scicchitano performed Google searches for train schedules between Stamford, Connecticut (where he lived) and Portland, Maine (where VFC is headquartered). Additionally, on that same day, Scicchitano performed several other Google searches suggesting he was preparing for an interview with VFC on April 2, 2018;

    f.   On April 3, 2018, the day after Scicchitano informed IDEXX that he was resigning, he performed a series of particularly concerning Google searches, which were:

        i.   "Erase entire outlook file on pc";

        ii.   "manually remove outlook emails";

        iii.   "deleting outlook profile from computer"; and

        iv.   "delete emails from outlook permanently."

    g.   That same day, April 3, 2018, Scicchitano inserted two separate external media devices into his IDEXX computer, one a TOSHIBA External USB 3.0, with serial no. 20140330010401F&0, and a second generic USB device, with serial no. 57442D575841314135305335&0.

95.     Between March 29, 2018 and April 3, 2018, Scicchitano accessed a number of files that, based on his taking a position with VFC, appear highly suspicious and lead IDEXX to conclude that Scicchitano misappropriated its trade secrets. Such files include:

    a.   Numerous documents pertaining to IDEXX's sales certification program;

    b.   Documents pertaining to IDEXX new hire training;

    c.   Documents pertaining to IDEXX's supervisor training plan;

    d.   Documents pertaining to IDEXX's territory training plans;

    e.   Documents pertaining to various IDEXX product testing training modules; and

    f.   Documents pertaining to key lab differentiators and territory revenue growth opportunities.

96.    All of the documents mentioned above are confidential documents within IDEXX. Indeed, IDEXX's internal training documents are labeled with "Internal Purposes Only."

97.    The vast majority of the documents that Scicchitano accessed were within the Dropbox account he loaded onto his IDEXX-issued computer. Because of this and because of his insertion of multiple external media devices on April 3rd, IDEXX believes that Scicchitano improperly uploaded or downloaded its trade secrets with the intent of using them on VFC's behalf.

98.    Giving his timed resignation, current responsibilities, and new job duties for VFC (where he is tasked with building VFC's training programs), Scicchitano had no legitimate business reason to access these documents.

99.    Indeed, IDEXX is particularly concerned that Scicchitano intends to or has already used IDEXX's confidential training materials to either directly copy IDEXX's programs or to use them as a reference guide in building VFC's program.

100.    Furthermore, after Scicchitano announced his resignation, he spoke with a number of IDEXX employees telling them that he was "building a team" and that there were "lots of opportunities at VFC." Because of this, IDEXX believes that Scicchitano has or will improperly solicit IDEXX employees to leave IDEXX's employ for VFC, in addition to his other breaches and misappropriating activities.

**EFFECT OF LEACH'S AND SCICCHITANO'S EMPLOYMENT WITH VFC**

101.    With the departure of Leach and Scicchitano and their possession and their knowledge of IDEXX's confidential information and trade secrets, IDEXX stands to lose millions of dollars in

intellectual property, and the loss of value of its trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

102. By definition of their positions with VFC and their possession of IDEXX's trade secrets, Leach and Scicchitano will undoubtedly use or threaten to use IDEXX's proprietary information.

103. More importantly, given the facts that IDEXX currently possesses regarding Leach's and Scicchitano's unauthorized access to and retention of IDEXX's trade secrets, neither can perform his job for VFC without violating their Agreements and without using IDEXX's trade secrets and confidential information.

104. Furthermore, VFC's decision to hire Leach into an identical Business Analyst role and Scicchitano to design VFC's training programs poses harm far beyond just significant monetary losses.

105. VFC will have an unfair advantage in targeting IDEXX's employees (who Scicchitano trained), developing marketing plans and campaigns based on IDEXX's successes and rejected plans, and in determining what new products to develop or not develop (based on Leach's design work). Defendants will have valuable know-how on how to design and improve VFC's own products, customer relationships, and goodwill.

106. All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to IDEXX, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to IDEXX's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make IDEXX whole.

**COUNT I**
**BREACH OF CONTRACT**
**(Leach)**

107. IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106.

108.    The Agreements that Leach entered into with IDEXX constitute valid and enforceable contracts.

109.    IDEXX performed all of the duties and obligations it agreed to and owed Leach under the Agreement.

110.    The post-employment activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect IDEXX's legitimate protectable interests in its confidential business information.

111.    Leach breached and continues to breach his post-employment contractual obligations owed to IDEXX by continuing to possess and, on information and belief, misusing IDEXX's confidential and proprietary information.

112.    Leach further breached and continues to breach his post-employment contractual obligations owed to IDEXX by holding the same or substantially the same position with VFC that he held with IDEXX.

113.    As a result of Leach's breaches of contract, IDEXX has been irreparably injured, and it continues to face irreparable injury. It is threatened with losing the value of its confidential and proprietary information, for which a remedy at law is inadequate.

114.    Accordingly, Leach must be enjoined and restrained by Order of this Court to cease using and possessing IDEXX's confidential and trade secret information.

115.    IDEXX also seeks its actual, incidental, compensatory, and consequential damages, along with its interest.

**COUNT II**
**BREACH OF CONTRACT**
**(Scicchitano)**

116.    IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106.

117.    The Agreements that Scicchitano entered into with IDEXX constitute valid and enforceable contracts.

118.    IDEXX performed all of the duties and obligations it agreed to and owed Scicchitano under the Agreement.

119.    The post-employment activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect IDEXX's legitimate protectable interests in its confidential business information.

120.    Scicchitano breached and continues to breach his post-employment contractual obligations owed to IDEXX by continuing to possess and, on information and belief, misusing IDEXX's confidential and proprietary information.

121.    Scicchitano further breached and continues to breach his post-employment contractual obligations owed to IDEXX by holding the same or substantially the same position with VFC that he held with IDEXX.

122.    As a result of Scicchitano's breaches of contract, IDEXX has been irreparably injured, and it continues to face irreparable injury. It is threatened with losing the value of its confidential and proprietary information, for which a remedy at law is inadequate.

123.    Accordingly, Scicchitano must be enjoined and restrained by Order of this Court to cease using and possessing IDEXX's confidential and trade secret information.

124.    IDEXX also seeks its actual, incidental, compensatory, and consequential damages, along with its interest.

## COUNT III
### ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS
### (MAINE UNIFORM TRADE SECRET ACT, M.R.S.A. Title 10 § 1541)
### (All Defendants)

125.    IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106.

126.   IDEXX's confidential and proprietary information includes, *inter alia*, IDEXX's strategy pertaining to its training programs, detailed information pertaining to IDEXX's software development plans and deliverables, details about its upcoming chemical analyzer, hematology, and other product developments, detailed information pertaining to IDEXX's sales employees' strengths and weaknesses, customers' software preferences in the eCoupon segment, the data analytics that IDEXX was utilizing for purposes of developing these programs, IDEXX's product development plans and strategies in VSS, detailed information pertaining to IDEXX's software development plans and deliverables, details pertaining to IDEXX's customer contracts, including contract termination dates, and other information pertaining to IDEXX's VSS business, people, and customers that is not known to the public or IDEXX's competitors, including VFC.

127.   This information constitutes trade secrets, pursuant to the Maine Uniform Trade Secret Act, M.R.S.A. TITLE 10 § 1541, *et seq.*, because IDEXX derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

128.   Leach and Scicchitano actually misappropriated and/or threaten to misappropriate IDEXX's trade secrets without its consent, in violation of Maine law.

129.   Defendants will be or is being unjustly enriched by the misappropriation of IDEXX's trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate its trade secrets.

130.   Defendants' actual and/or threatened misappropriation have been willful and malicious, particularly given: (a) Leach's repeated efforts to download and improperly access and retain IDEXX trade secret information after beginning to interview with and accepting employment with VFC; (b) Scicchitano's uploading and use of Dropbox on his computer weeks before his sudden departure to

VFC, and his downloading of sensitive IDEXX information on his last day of IDEXX employment; and (b) Leach's and Scicchitano's efforts to hide their new employment with VFC.

131.    As a result of the threatened and/or actual misappropriation of IDEXX's trade secrets, IDEXX has been injured and faces irreparable injury. IDEXX is threatened with losing its trade secrets in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

## COUNT IV
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *et seq.*
### (All Defendants)

132.    IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106, and 126 through 131.

133.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.  *See* 18 U.S.C. §§ 1836, 1839.

134.    Defendants acquired IDEXX's trade secrets by improper means and without authorization. In particular, Leach and Scicchitano obtained trade secrets from IDEXX through, *inter alia*, having accessed and retained IDEXX's confidential information and trade secrets even after their respective resignations. As discussed in great length above, IDEXX's forensic review identified multiple external devices and Cloud-based accounts onto which IDEXX's trade secret information was stored and, which Leach and Scicchitano have not returned, despite repeated requests to do so.

135.    Upon information and belief, Leach and Scicchitano have also disclosed IDEXX's trade secrets to VFC in violation of their obligations under their Agreements and/or have or threaten to

misappropriate IDEXX's trade secrets in violation of the DTSA.

136.   The information that Leach and Scicchitano both have, upon information and belief, provided to VFC or threaten to provide to VFC regarding IDEXX's strategic plans and research and development plans constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

137.   As detailed above, IDEXX takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

138.   Defendants knew or should have known that IDEXX's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by IDEXX at great expense and effort; (d) are maintained as confidential and are not generally available to the public or IDEXX's competitors; (e) would provide significant benefit to a competitor seeking to compete with IDEXX; and (f) are critical to IDEXX's ability to conduct their businesses successfully.

139.   As detailed above, Leach and Scicchitano transferred and/or wrongfully obtained and accessed IDEXX's trade secrets and failed to return IDEXX's information, despite repeated requests from IDEXX for Defendants to do so.

140.   As detailed above, Leach and Scicchitano actively continued gathering IDEXX's trade secrets even while they were in the process of obtaining employment with VFC. In fact, even after receiving an offer of employment from VFC in October 2017 (Leach) and March 2018 (Scicchitano), both nevertheless continued to download IDEXX's trade secrets to external media devices and/or cloud-based repositories. The only purpose for Defendants to obtain and retain IDEXX's trade secrets is to use them to compete against IDEXX for Defendants', including VFC's, benefit.

141.    By disclosing and/or threatening to disclose IDEXX's trade secrets to VFC without IDEXX's consent, Leach and Scicchitano have misappropriated or threaten to misappropriate IDEXX's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

142.    The information that Defendants have misappropriated or threaten to misappropriate describes and relates to IDEXX's highly confidential research and development plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

143.    Should Defendants continue to disclose or threaten to disclose IDEXX's trade secrets, the disclosure of such information will harm IDEXX and its legitimate business interests.

144.    If information pertaining to IDEXX's trade secrets are disclosed by Leach and Scicchitano to VFC or other competitors of IDEXX, it could destroy IDEXX's competitive advantage.

145.    Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, IDEXX requests that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of IDEXX's trade secrets, in addition to granting IDEXX its attorneys' fees and exemplary damages.

**COUNT V**
**CONVERSION**
**(Leach and Scicchitano)**

146.    IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106.

147.    Leach and Scicchitano removed from IDEXX or retained its property, including but not limited to, confidential and proprietary information, without authorization, and converted it to his own use.

148.    IDEXX demanded from Leach and Scicchitano that each return its confidential information, through the terms of their Agreements.

149.    IDEXX is entitled to the return of its property from Leach and Scicchitano, according to their Agreements.

150.    Leach and Scicchitano failed to return to IDEXX its property.

151.    As a direct and proximate result of Leach's and Scicchitano's actions, IDEXX has been damaged.

152.    IDEXX has suffered damages as a result of Leach's and Scicchitano's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property.

153.    Because Leach's and Scicchitano's actions were willful, malicious, outrageous, oppressive or done in complete disregard of the consequences they might have for IDEXX, IDEXX should be awarded exemplary and punitive damages in an amount to be proven at trial.

**COUNT VI**
**<u>TORTIOUS INTERFERENCE WITH CONTRACT</u>**
**(Against VFC)**

154.    IDEXX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 106.

155.    As set forth above, each of Leach's and Scicchitano's Non-Compete Agreements and Non-Disclosure Agreements are valid and enforceable contracts. The post-employment activity covenants, confidentiality covenants and other provisions contained in the Non-Compete Agreements and Non-Disclosure Agreements are reasonable in scope and duration and are reasonably necessary to protect IDEXX's legitimate protectable interests in its long-standing, well-established and valuable customer relationships and its confidential information, as well as its goodwill.

156.    VFC was fully aware of the Non-Compete Agreements and Non-Disclosure Agreements prior to hiring both Leach and Scicchitano, as evidenced by telling Leach that VFC believed the Agreements were not enforceable. They also retained both Leach and Scicchitano, even after IDEXX

notified VFC of Leach and Scicchitano's non-compete breaches and after IDEXX provided VFC with copies of the Agreements.

157.   VFC, in telling Leach and Scicchitano (as well as telling other IDEXX employees the same) that their Agreements were unenforceable, fraudulently induced Leach and Scicchitano to leave IDEXX.

158.   In particular, on or about October 18, 2017, Leach told Patty Minerich, that VFC, through its recruiter, told Leach that "the noncompete was not a problem." On information and belief, VFC made this statement to Leach around late September 2017 through October 18, 2017.

159.   Subsequently, IDEXX also learned from an employee, Krystal Jean, that, while Jean was intervieweing with VFC, she asked VFC how she could take a position with VFC due to her IDEXX non-compete, and further telling VFC that IDEXX advised her that VFC was a competitor. In response, VFC's recruiter told Jean that her IDEXX non-compete was not an issue. Jean terminated her IDEXX employment in early 2018, but subsequently rejoined IDEXX in May 2018. On information and belief, VFC made the statement to Jean around the time at which she interviewed with VFC.

160.   On information and belief, VFC made substantially similar statements to each of the IDEXX employees who terminated their IDEXX employment in favor of VFC, including, but not limited to, Scicchitano.

161.    These statements were fraudulent because VFC knew or should have known that the IDEXX agreements are both enforceable and because IDEXX repeatedly told VFC that IDEXX and VFC were competitors, including on December 22, 2017 (see Exhibit 6), as well as April 4, 2018 (see Exhibit 8).

162.   Despite knowing that the IDEXX agreements were enforceable and that IDEXX and VFC are competitors, VFC made these fraudulent statements to induce IDEXX employees, including Leach and Scicchitano, to terminate their employment with IDEXX and take employment with VFC, which, on

30

information and belief, such employees would not have done but for their mistaken belief that the IDEXX agreements were not enforceable.

163.    Further, despite having knowledge of the Non-Compete Agreements and Non-Disclosure Agreements, VFC also permitted and incentivized Leach and Scicchitano to violate the post-employment and contractual obligations owing to IDEXX, without justification, in an effort to employ each of them, move IDEXX's customers and workforce, and/or unfairly compete with IDEXX.

164.    VFC's intentional interference was willful, malicious, unjustified and accomplished through fraudulent means, including but not limited to, inducing, and aiding or abetting Leach and Scicchitano to breach their contracts with IDEXX.

165.    VFC's interference with the Non-Compete Agreements and Non-Disclosure Agreements are separate and apart from, and unrelated to, its threatened and/or actual misappropriation of IDEXX's trade secrets.

166.    As a result of VFC's tortious interference, IDEXX has suffered irreparable and other significant injuries.

### **PRAYER FOR RELIEF**

WHEREFORE, IDEXX Laboratories, Inc. seek judgment in their favor and an Order against Defendants that grants the following relief:

A.    Preliminarily and permanently enjoining Defendants Dan Leach, Agostino Scicchitano, Direct Vet Marketing, Inc., and all parties in active concert or participation with them, from using or disclosing any of IDEXX's confidential and/or proprietary information;

B.    Preliminarily and permanently enjoining Defendants Dan Leach and Agostino Scicchitano from engaging in or participating in any employment or activity competitive with IDEXX on Vets First Choice's behalf, insomuch as such activity is competitive with IDEXX and was a service performed by Leach and/or Scicchitano on IDEXX's behalf.

C.    Ordering Defendants Dan Leach, Agostino Scicchitano, Direct Vet Marketing, Inc., and all parties in active concert or participation with them, to return to IDEXX all originals and copies of all files, devices and/or documents that contain or relate to IDEXX's confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

D. Ordering Defendants Dan Leach, Agostino Scicchitano, Direct Vet Marketing, Inc., and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by Leach and/or Scicchitano;

E. Awarding IDEXX actual, incidental, compensatory, and consequential damages to be proven at trial;

F. Awarding IDEXX exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

G. Awarding IDEXX its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Maine Uniform Trade Secret Act, M.R.S.A. TITLE 10 §1541, *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. §1832;

H. Awarding IDEXX such further relief as the Court deems necessary and just.

DATED: AUGUST 3, 2018     Respectfully submitted,

            **IDEXX LABORATORIES, INC.**


            By: ___*/s/ Adrianne E. Fouts*_____
               One of Its Attorneys


Adrianne E. Fouts
DRUMMOND WOODSUM
84 Marginal Way
Suite 600
Portland, Maine 04101
Telephone: (207) 772-1941
Facsimile: (207) 772-3627

Michael D. Wexler
Justin K. Beyer
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

*Attorneys for Plaintiff IDEXX Laboratories, Inc.*